### · DALLAS RY. & TERMINAL CO. v. ARCHER et al.

#### No. 13235.

Court of Civil Appeals of Texas. Dallas.

Nov. 6, 1942.

Rehearing Denied Jan. 8, 1943.

Burford, Ryburn, Hincks & Charlton and W. M. Taylor, Jr., all of Dallas, for appellant.

C. W. Starling and Carden, Carden & Hemphill, all of Dallas, for appellees.

BOND, Chief Justice.

Appellees (three minors), by their mother as next friend, instituted this suit against appellant, Dallas Railway & Terminal Company, for damages alleged to have been occasioned by the wrongful death of their father, A. H. Archer, as the result of an electric shock received when he walked into an uninsulated wire which had been broken and blown from the defendant's poles by a severe windstorm, falling on the company's trolley wire and extending across a public street and sidewalk onto a vacant lot.

The death of Mr. Archer was the result of peculiar circumstances: On Sunday, January 8, 1939, about 4:30 p.m., a windstorm struck the City of Dallas from the southwest with an extreme velocity of 66 miles per hour. Considerable damage was done to trees, buildings, telephone and electric wires and street cars along Jefferson Street, particularly between intersections of Storey and Crawford Streets with Jefferson. On the southwest corner of the intersection of Jefferson and Storey Streets was an old iron clad armory building which was, by the storm, almost demolished; its galvanized roofing and supporting timbers, 2 x 6s, 18 to 20 ft. long, were blown upward and across Jefferson onto the vacant lot on the north side of the street, carrying with them the telephone wire theretofore supported on the top of the trolley poles.

At the time of the occurrence and for many years prior thereto, the Dallas Railway & Terminal Company had maintained, under lease, the street car tracks, trolley poles and wires in the center of Jefferson Street. All poles, crossarms and wires were kept in place and their maintenance is in nowise questioned here. Prior to the leasing of the tracks, trolley poles and wires, the lessor, Northern Texas Traction Company, an interurban corporation, used the leased property together with the telephone wire, in operating its railway between Dallas and Fort Worth, the wire constituting a part of its telephone system. In leasing the property, the interurban company retained for its exclusive use the telephone wire on top of the poles, assuming its maintenance; and the lessee, (defendant) recognizing the exclusion from the lease, exercised no control over, right or interest in the telephone line. The lease (excluding the telephone line), with all its terms and conditions, was incorporated in defendant's franchise with the City of Dallas, under which it operated its street cars over and along the streets of the City, particularly in the center of Jefferson Street.

The death of appellees' father resulted from injuries received when he came in contact with the broken telephone wire while walking along the north side of Jefferson Street. The wire, broken by the force of the storm, was wrapped around appellant's trolley wire, electrically charged, and blown across the sidewalk, the broken end extending onto the vacant lot. The death of Mr. Archer occurred about twenty minutes after the storm had spent its force and while rain was still falling heavily. At the time, appellant's poles, tracks and trolley wires were all in place. Thus it will be seen that the defendant's leased property furnished only a condition by which the injury was made possible. The windstorm, or vis major, and not the Railway Company's equipment, was the proximate cause of the injury and death of Mr. Archer. No danger existed in the condition created by the defendant's poles or trolley wires.

The rule is thus stated in 29 Cyc. 496, that "A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, and efficient cause of the injury. If no danger existed in the condition except because of the independent cause such condition was not the proximate cause." The rule is similarly stated in Phoenix Refining Co. v. Tips, 125 Tex. 69, 81 S.W.2d 60; Panhandle & S. F. Ry. Co. v. Sledge, Tex.Civ.App., 31 S.W.2d 146; Id., Tex.Com.App., 45 S.W.2d 1112; Garrett v. Sinclair Refining Co., Tex.Civ.App., 94 S.W.2d 1218; Burton v. Cumberland T. & T. Co., Ky., 118 S.W. 287. Therefore, unless it can be said that the defendant's street car operators were guilty of negligence, after the storm, in failing to exercise reasonable diligence to warn the public of the danger, or to barricade the sidewalk with rails and other visible objects; or to cut off the electricity from its trolley wire to prevent injury after discovering the danger; and that such negligence, if any, is attributable to the defendant corporation, it cannot be said that liability attaches because of the tracks, poles and wires being in the street.

The jury found that "the employes of the defendant" and "the defendant acting through some one or more of its employes" were guilty of (1) failing by voice to give warning to Mr. Archer of the presence of the electrically charged wire across the sidewalk, and that such was negligence and a proximate cause; (2) failing to keep someone near where the electrified wire was across the sidewalk to warn pedestrians of the presence and danger thereof, and that such was negligence and a proximate

cause; (3) failing to place about the wire, where it was across the sidewalk, some rail or other physical object which would serve as a warning of danger, and that such was negligence and a proximate cause; (4) failing to shut off the power which electrically charged the wire lying across the sidewalk, and that such was negligence and a proximate cause; and (5) failing to remove the electrically charged wire from the sidewalk before Mr. Archer's fatal injury, and that such was negligence and a proximate cause. These are the negligent acts of the defendant, complained of by plaintiff, and are the only ones submitted to and answered by the jury on which the trial court based its judgment. It will be seen that these issues only charged the defendant with failure to exercise ordinary care after the storm in failing to correct the dangerous condition after its discovery, or in the exercise of ordinary care, that it should have discovered the condition. Aside from the question as to whether notice to a street car operator of the dangerous condition was notice to the defendant corporation, the defendant was entitled to reasonable time in which to correct or remedy the condition. Bowman et ux. v. Farmersville Mill & Light Co., Tex.Civ.App., 158 S.W. 200, writ refused. Texas-Louisiana Power Co. v. Webster, 127 Tex. 126, 91 S.W.2d 302.

On the specific acts of negligence found by the jury, the evidence is undisputed: The uninsulated telephone wire was owned, operated and maintained by another company. It was broken loose and wrapped around appellant's trolley wire only by violence of the windstorm and that too only about twenty minutes prior to the time Mr. Archer lost his life. The only employe of the company in the locality of the fatal occurrence at the time, who might have known of the dangerous condition prior to the occurrence, was a Mr. Middlebrook, a street car operator, without technical knowledge of electricity and without equipment to handle electrically charged wire, and whose duty it was only to operate the street car, protect his passengers, and notify the company's dispatcher of any unusual occurrence on or about the company's railway line. Mr. Middlebrook took charge of his car at 4:26 p. m. on the Sunday afternoon, ran it slowly for ten or eleven blocks from the east, and stopped because of the storm at a point opposite the place where Mr. Archer was killed. His attention was then called to the flashing of elec-

tricity grounded on the vacant lot located north of the street. He immediately secured a raincoat from one of his passengers, braved the wind and rain and went to a telephone at a private residence on the south side of the street, called the company's dispatcher and advised him of the electrical disturbance, and then returned to his car. He was gone five or six minutes. Soon thereafter (three or four minutes) a squad of city firemen appeared and began clearing the tracks, street and sidewalks of the storm's debris, timbers, trash and galvanized iron roofing blown from the armory building, and otherwise supervising and directing travel about the affected area; took charge of the situation and instructed Mr. Middlebrook to proceed with his car to avoid congestion at that point. Thus the street car moved forward about half a car length when Mr. Middlebrook's attention was called to a man's entanglement in the telephone wire. The firemen and others nearby were frantically calling to Mr. Archer to stop, warning him of the danger where he was walking, but he continued his walk, with his hat over his face, apparently for protection from the wind and rain; and, without hearing the warning, Mr. Archer came in contact with the charged telephone wire. Under the related circumstances, we fail to see what, if anything, more operator Middlebrook could have done to avoid the death of Mr. Archer.

The evidence further shows that the street was covered with water, it was raining and much of the galvanized iron was strewn on the sidewalk and piled upon the telephone wire. Manifestly, the area was dangerous for anyone not equipped to cope with such a situation. Mr. Middlebrook was not required to leave his car and passengers, go and stand guard over the electrified wire, or seek a rail or other physical objects to barricade the sidewalk in the face of supervision of the area by city firemen; and furthermore, for the lack of reasonable time in which to correct or remedy the condition. It is not the doing or failure to do every act to avert injury that is negligence in a legal sense. To constitute negligence, the act done or omitted must be one which a person of ordinary prudence would not have done, or would not have omitted to do, as the case may be; and from which act or omission it ought reasonably to have been anticipated that injury would result. Many times the wisdom comes after the event suggests

some expedient by which, through the exercise of more abundant caution, the event might have been averted. So, we think, the failure of the defendant's operator Middlebrook, in the particulars found by the jury's verdict, was not the proximate cause of the unfortunate occurrence.

In Buchanan v. Rose, 138 Tex. 390, 159 S.W.2d 109, 110, the dangerous condition causing the injury to the plaintiff in that case was not attributed to any negligence of the defendant. The specific element of negligence relied on was the failure to put up warnings to protect the traveling public from being injured as a result of the condition. Chief Judge Alexander, speaking for the court, said: "There are many instances in which it may be said, as a matter of law, that there is a duty to do something, and in others it may be said, as a matter of law, that there is no such duty. Using familiar illustrations, it may be said generally, on the one hand, that if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby. On the other hand, it may be said generally, as a matter of law, that a mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others. Under the last rule, a bystander may watch a blind man or a child walk over a precipice, and yet he is not required to give warning. He may stand on the bank of a stream and see a man drowning, and although he holds in his hand a rope that could be used to rescue the man, yet he is not required to give assistance. He may owe a moral duty to warn the blind man or to assist the drowning man, but being a mere bystander, and in nowise responsible for the dangerous situation, he owes no legal duty to render assistance."

With reference to cutting off the power and electricity from the trolley wire, such might be answered that there was not sufficient intervening time between the fatal incident, and the creation of the condition that caused the incident. The storm which caused the dangerous condition having occurred about 4:30 and Mr. Archer walking into the telephone wire about fifteen or twenty minutes thereafter evidences a lack of time to effectually cut off the electric power. During this intervening time, it will be observed that the operator of the street car had to call the dispatcher, and the dispatcher contacted the lineman, and about five or six minutes after the death of Mr. Archer, employes of the company, equipped to cope with such dangerous situation arrived and cut the telephone wire from the company's trolley line. The power generating electricity to the trolley wire was not cut off, and the evidence reflects that to do so, the dispatcher, after being advised by Mr. Middlebrook of the electrical disturbance on the line, would have had to call the dispatcher of the Dallas Power & Light Company, who furnished the electricity, to tell him exactly what was wanted with reference to cutting off the power; the Light Company, in turn, would have to call the particular substation involved, get the substation's operator and relay the trouble to him, and then the substation operator would have to proceed to carry out the orders. The evidence further reflects that there was not time before the fatal incident within which to make all necessary telephone connections, calls and instructions. Aside from this, the evidence is replete that the cutting off of the power from the entire system would likely engender more damage than by one wire down at an isolated point, by stopping all street cars; and that it is contrary to good practice in the street car industry to cut off the power under the related circumstances. By taking the power from trolley wires without knowing exactly where the street cars are located with reference to street intersections, railroad crossings, etc., increases the probability of danger more than the one wire down.

██ Under the facts in this case, there is no legal negligence on the part of defendant or any of its agents in failing to give warning to the deceased, or in failing to place barricades about the affected area, or in failing to remove electrified wire or cut the power from the trolley wire. Elements of time, knowledge and duty all enter into this case in favor of the defendant, hence no actionable negligence is shown. The defendant's motion for instructed verdict, or in the alternative, motion for judgment notwithstanding the verdict, should have been granted and judgment rendered for the defendant. For the error of the trial court on refusal to render judgment for the defendant, it becomes the duty of this court to render such judgment as should have been ren-

dered by the trial court. The judgment of the court below is reversed and here rendered for the defendant.

Reversed and rendered.